**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TECHRADIUM, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-13-2487 |
| | § | |
| FIRSTCALL NETWORK, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

TechRadium, Inc. sued FirstCall Network, Inc. and the City of Friendswood, alleging that FirstCall sold products to the City of Friendswood incorporating TechRadium's patented technology without a license or TechRadium's permission. The allegedly infringed patent is TechRadium's U.S. Patent No. 7,773,729 (the '729 Patent), which claims a device for providing digital notification to, and receiving responses from, a large number of users. FirstCall develops and markets digital mass-notification systems. The City of Friendswood bought and uses First Call's messaging and weather-alert systems.

The defendants moved for summary judgment of noninfringement, arguing that this court's prior construction of related TechRadium patents established that FirstCall's messaging and weather-alert systems could not perform all the claimed steps of the '729 Patent. (Docket Entry No. 54). The defendants argue that the FirstCall systems do not have "user selected grouping information," and that "user" has the same meaning in the '729 Patent that this court found in construing the same term in two related patents at issue in a prior case. TechRadium responded, asking this court to construe the terms "user" and "administrator" in the '729 Patent more broadly

1

than it construed the same terms in the related TechRadium patents.  (Docket Entry No. 57).  The defendants replied.  (Docket Entry No. 58).

On April 30, 2014, the court held a hearing under *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), at which the parties presented arguments in support of their competing constructions.  Both TechRadium and the defendants filed claim-construction briefs.  (Docket Entry Nos. 64, 65, 66).

Based on the pleadings, the motions and briefs, the record, the arguments of counsel, and the applicable law, the court construes the disputed term "user" to mean "an intended recipient of a message sent by an administrator," and finds it unnecessary to construe the term "administrator." Viewing the claim construction in light of the record and law leads to the conclusion that FirstCall did not infringe TechRadium's '729 Patent.  The defendants' motion for summary judgment is granted, and final judgment is entered by separate order.

The reasons for these rulings are set out below.

## I.    Background

TechRadium is in the mass-notification and emergency-communications business. TechRadium owns method and apparatus patents for providing simultaneous digital message notification to, and receiving responses from, a large number of recipients.  TechRadium's patented mass notification systems permit an administrator to initiate transmission of a single message to members of a group across multiple communication platforms, such as computers or phones.  The message recipients may provide contact-preference information for different types of alerts.  For example, a recipient may wish to receive routine notifications by e-mail but urgent notifications by SMS.  The recipients can also identify grouping information by indicating that they wish to receive

messages sent to certain groups, such as residents of a particular ZIP code, Spanish speakers, employees of a certain department, or parents of children in a second-grade class.  The administrator composes a single message using an administrator interface and initiates transmission.  The message is automatically sent to the recipients through multiple communication gateways (SMS, e-mail, voice call) according to each recipient's expressed contact preferences.  After the message is sent, the administrator receives information reporting whether each intended recipient received the message.

FirstCall operates a patented mass-messaging system.  The administrator in the FirstCall systems, using an administrator interface, selects the recipients by geographic area and determines how they are to be contacted.  The City of Friendswood uses FirstCall's system.

FirstCall also offers a patented "StormAlert" system, which permits participants to sign up with FirstCall to receive feeds from the National Weather Service ("NWS").  Under the StormAlert system, a message is not initiated, prepared, or distributed by a client administrator, but by the NWS.  The NWS does not use the FirstCall administrator interface to send messages.  Instead, FirstCall receives NWS's distributed feeds and applies a filter so that each StormAlert participant receives only the type of information feed the participant previously selected.

TechRadium filed an earlier patent-infringement suit against Edulink Systems, Inc., a company also in the mass-messaging and emergency-communications business.  In that case, this court construed the term "user" in TechRadium's U.S. Patent Nos. 7,496,183 ('183) and 7,519,165 ('165).  *See TechRadium, Inc. v. Edulink Sys.*, No. H-10-1887, 2012 U.S. Dist. LEXIS 189753 (S.D. Tex. July 16, 2012).  The '183 and '165 patents are both children of the '729 Patent at issue in this case.  The '729 Patent is in turn a child of U.S. Patent No. 7,130,389 ('389).  The '183 and '165

3

Patents are both method patents, while the '729 and '389 Patents are apparatus patents.

The present action began with separate suits against FirstCall and the City of Friendswood alleging infringement under 35 U.S.C. §§ 271 and 285.  The two cases were consolidated.  (Docket Entry No. 37).  TechRadium alleges that the FirstCall system violates Claim 1 of the '729 Patent, which states:

> 1. A digital notification and response system for preparing and transmitting at least one message from an administrator using at least one processor to at least one user on a network, wherein each user of the network has at least one user contact device, wherein the system comprises:
>    a. an administrator interface for transmitting a message from an administrator to at least one user contact device;
>    b. a dynamic information database for preparing the message for transmission, wherein the dynamic information database comprises:
>       i. user contact data comprising user contact device information; and
>       ii. user selected grouping information comprising at least one group associated with each user of the network; and
>       iii. response data comprising user response information that indicates the at least one user contact devices have received the message; and
> wherein the administrator initiates preparation and distribution of at least one message to a network using the user selected grouping information and wherein the message is transmitted through at least two industry standard protocols simultaneously, and the message is received by the at least one user contact device in the network, and the at least one user contact device transmits a response through the industry standard protocols to the dynamic information database.

'729 Patent, cols. 8, ll. 45–67; 9, ll. 1–4.

FirstCall argues that the FirstCall messaging system and StormAlert system do not have "user selected grouping information" and cannot perform all of the steps of Claim 1 of the '729 patent.  As a result, FirstCall asserts that it is entitled to a judgment of noninfringement as a matter

of law.

## II.    The Applicable Legal Standards

### A.    Claim Construction

It is a "bedrock principle" that "'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court." *Markman*, 517 U.S. at 372. A court is to read the patent from the vantage of a person having ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1313. Such a person "'is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field.'" *Id.* (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)); *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) (cautioning courts not to interpret claim terms "in a vacuum" (quotation omitted)). Claim terms are "'generally given their ordinary and customary meaning,'" which means "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

When the ordinary meaning is readily apparent, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. If this meaning is not readily apparent, the court reviews "the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history."

5

*Vitronics*, 90 F.3d at 1582; *see also Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011) ("[T]he role of a district court in construing claims is . . . to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence."). The court first looks "to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." *Vitronics*, 90 F.3d at 1582. Claims must also be construed in context of surrounding claim language. *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms."); *accord Lexion Medical, LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011).

Courts also review the "specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics*, 90 F.3d at 1582. The Federal Circuit has repeatedly stated that "claims 'must be read in view of the specification, of which they are a part.'" *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d 967, 979 (Fed. Cir. 1995)). The specification, a "concordance for the claims," *id.* (quoting *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 397–98 (Ct. Cl. 1967)), is the "best source for understanding a technical term," *id.* (quoting *Multiform Desiccants*, 133 F.3d at 1478). *See also Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention."). When the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. . . . the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359,

1366 (Fed. Cir. 2002)).  "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor."  *Id.* (citing *Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001)); *see also Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (explaining that claim construction may deviate from the ordinary and customary meaning of a disputed term only if (1) a patentee sets out a definition and acts as his own lexicographer, or (2) the patentee disavows the full scope of a claim term either in the specification or during prosecution).

"'The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'"  *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Società per Azioni*, 158 F.3d, 1243, 1250 (Fed. Cir. 1998)).  "There is a fine line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims."  *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011).  Courts must "capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention."  *Id.*

"[A] court 'should also consider the patent's prosecution history, if it is in evidence.'"  *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980).  The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Id.* (citing *Vitronics*, 90 F.3d at 1582–83); *see also Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) ("[T]he

7

specification is the primary source for determining what was invented and what is covered by the claims, elucidated if needed by the prosecution history.").  The prosecution history includes "all express representations made by or on behalf of the applicant to the examiner to induce a patent grant, or . . . to reissue a patent. . . . includ[ing] amendments to the claims and arguments made to convince the examiner that the claimed invention meets the statutory requirements of novelty, utility, and nonobviousness."  *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985); *see also Sanofi-Aventis Deutschland GmbH v. Genentech, Inc.*, 473 F. App'x 885, 888 (Fed. Cir. 2012) ("We have held that an otherwise broadly defined term can be narrowed during prosecution through arguments made to distinguish prior art.") (citing *Phillips*, 415 F.3d at 1317 ("The prosecution history . . . consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent.")).

"The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution."  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003); *see also SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005).  The doctrine applies even if the concessions were not necessary to make the invention patentable.  *See Uship Intellectual Props., LLC v. United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013) ("We find no support for [the] proposition that prosecution disclaimer applies only when applicants attempt to overcome a claim rejection.  Our cases broadly state that an applicant's statements to the PTO characterizing its invention may give rise to a prosecution disclaimer."); *cf. Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1583 (Fed. Cir. 1995) ("Estoppel extends beyond the basis of patentability . . . . Clear assertions made during prosecution in support of patentability, whether or

not actually required to secure allowance of the claim, may also create an estoppel.") (citing *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165 (Fed. Cir. 1993)).[1]  The doctrine does not apply "where the alleged disavowal of claim scope is ambiguous." *Omega Eng'g*, 334 F.3d at 1324; *see also id.* at 1325 ("[W]e have required the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness and so unmistakable as to be unambiguous evidence of disclaimer.") (citations omitted).  Only when "the patentee has unequivocally disavowed a certain meaning to obtain his patent [does] the doctrine of prosecution disclaimer attach[ ] and narrow[ ] the ordinary meaning of the claim congruent with the scope of the surrender." *Id.* at 1324.

Courts may also "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980).  Although extrinsic evidence "'can shed useful light on the relevant art,' it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Zircon Corp. v. Stanley Black*

---

[1]  "There is a clear line of distinction between using the contents of the prosecution history to reach an understanding about disputed claim language and the doctrine of prosecution history estoppel which 'estops' or limits later expansion of the protection accorded by the claim to the patent owner under the doctrine of equivalents when the claims have been purposefully amended or distinguished over relevant prior art to give up scope. . . . [T]he two uses of the prosecution history must not be confused." *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 862 (Fed. Cir. 1991) (citations and internal quotation marks omitted); *see also Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358–59 (Fed. Cir. 2001) (distinguishing the two); *Spectrum Int'l Corp. v. Sterilite Corp.*, 164 F.3d 1372, 1378 n.2 (Fed. Cir. 1998) (same).  "Just as prosecution history estoppel may act to estop an equivalence argument under the doctrine of equivalents, positions taken before the PTO may bar an inconsistent position on claim construction . . . ." *Ballard Med. Prods.*, 268 F.3d at 1359 (quoting *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1457 (Fed. Cir. 1998)) (alteration omitted).  When the accused infringer argues that the prosecution history results in a narrowing of a claim's scope, there is no difference, and the Federal Circuit has refused to reverse based on references to estoppel.  *See id.* at 1359 ("Because the substance of the district court's analysis was sound, we disregard the fact that the court used the term 'prosecution history estoppel' in an unconventional manner."); *Biodex Corp.*, 946 F.2d at 862–63 (observing that "Biodex is technically correct in asserting that the doctrine of prosecution history estoppel is 'irrelevant' to determination of literal claim scope" but upholding the district court because prosecution history is relevant to claim interpretation) (citation omitted).

& *Decker, Inc.*, 452 F. App'x 966, 972–73 (Fed. Cir. 2011) (quoting *Phillips*, 415 F.3d at 1317). Extrinsic evidence is "in general . . . less reliable than the patent and its prosecution history" because it is "not part of the patent" and was not created at the time of the patent's prosecution; "extrinsic publications may not be written by or for skilled artisans"; and expert reports and testimony created at the time of litigation may "suffer from bias not present in intrinsic evidence." *Phillips*, 415 F.3d at 1318. A court must exercise "sound discretion" in admitting and using extrinsic evidence. *Id.* at 1319; *see also Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984) ("A trial judge has sole discretion to decide whether or not he needs, or even just desires, an expert's assistance to understand a patent. We will not disturb that discretionary decision except in the clearest case.").

"[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319. Although it is generally permissible for a court to consider extrinsic evidence, such evidence must not relegate the intrinsic evidence to a mere "check on the dictionary meaning of a claim term." *Id.* at 1320–21 (noting that relying on dictionaries "too often" causes "the adoption of a dictionary definition entirely divorced from the context of the written description"). "The sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id.* at 1324 (citing *Vitronics*, 90 F.3d at 1582).

### B.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the

burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

11

### C.      Patent Infringement

Analyzing patent infringement claims involves two analytic steps.  *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1373 (Fed. Cir. 2004); *Scanner Tech. Corp. v. ICOS Vision Sys. Corp., N.V.*, 365 F.3d 1299, 1302 (Fed. Cir. 2004).  The court first determines the meaning and scope of the asserted claims.  *Scanner Tech.*, 365 F.3d at 1302; *Novartis Pharm. Corp. v. Eon Labs Mfg., Inc.*, 363 F.3d 1306, 1308 (Fed. Cir. 2004).  Claim construction is a matter of law.  *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).  A court primarily relies on intrinsic evidence — the claims, the written specification, and the prosecution history — to understand the claims.  *Phillips*, 415 F.3d at 1314.  In most cases, the best source for determining the meaning of claim terms is the specification in which the patentee describes the invention.  A court may secondarily rely on extrinsic evidence, including expert testimony, dictionaries, and technical treatises, to understand the meaning and scope of particular terms.  *Id.*  The second step calls for the court to compare the construed claims to the allegedly infringing method or product to determine whether the claims encompass the accused method or product.  *Bai*, 160 F.3d at 1353.

## III.    Analysis

### A.      The Disputed Terms

The term "user," in both singular and plural forms, appears multiple times throughout the '729 Patent claims.  TechRadium proposes construing "user" to mean "individuals or entities that can receive a message, send a message, respond to a message, receive more than one message, respond to more than one message, or combinations of these activities."  (Docket Entry No. 57 at 14).  This proposed construction is a verbatim quote from the specifications.  '729 Patent, col. 4, ll. 14–18.  TechRadium argues that in the context of the claims and specifications, "user" refers to

12

"both a message sender and a message recipient," and "a 'user' is also an administrator." (Docket Entry No. 57 at 18).

Under TechRadium's proposed construction, "user" can encompass an administrator initiating transmission of a message and those intended to receive the message on contact devices. The defendants propose a narrower construction. They define "user" as "an intended recipient of a message sent by an administrator." (Docket Entry No. 65 at 4).

The main difference between the parties' proposed constructions is whether "user" is limited to message recipients or whether it includes both message recipients and the administrators, who are message-senders. The parties agree that an intended recipient of a message sent via the digital mass-notification system described in the patents is a "user." The parties also agree that a message sender — an administrator — who receives the transmitted message is also a "user." But the parties dispute whether a message sender who is not also an intended recipient of the transmitted message is a "user." TechRadium's proposed construction includes all administrators; the defendants' proposed construction includes only those administrators who are message recipients.

In *Edulink*, this court construed substantially similar claim language in TechRadium's '183 and '165 Patents, both child patents of the '729 Patent. 2012 U.S. Dist. LEXIS 189753, at *1. All three patents "claim[] the benefit" of the '389 parent Patent. '729 Patent, col. 1, l. 7; '165 Patent, col. 11, l. 9; '183 Patent, col. 1, l. 8. Although the language used in the '165 and '183 Patents differs from the language used in the '729 Patent, there are no material differences in the way "users" and "administrators" are described across the patents. Claim 1 in the '165, '183, and '729 Patents refers to "user selected grouping information comprising at least one group associated with each user on the network." '729 Patent, col. 8, ll. 57–59; '183 Patent, col. 12, ll. 23–24; '165 Patent, col. 11, ll.

48–49.  Although this court's prior construction of the '183 and '165 Patents does not control the construction of the '729 Patent, the relation between the patent at issue and the patents examined in *Edulink* weighs heavily in favor of consistent construction of the same terms in related patents.

The '729 Patent claims and specifications independently support recognizing a distinction between "users" and "administrators."  Each serves a clearly different function.  An administrator uses the digital mass-notification system to initiate sending a message to intended recipients.  (Docket Entry No. 53, Ex. 1).  A "user" is an intended recipient of the transmitted messages.  Claim 1 consistently uses "administrator" and "user" separately, strongly suggesting that they are separate entities.  Figure 1 of the embodiment shows users receiving messages on their "user contact devices."  They are displayed as distinct from the administrator and from the administrator interface.  Though an "administrator" who is an intended recipient of a transmitted message is also a "user," that "administrator" is a "user" only because he is an intended recipient, not because he initiates sending the message.

The statement in the specifications that "[t]he users can be individuals or entities that can receive a message, send a message, respond to a message . . . or any combinations of these activities" does not support construing "user" to cover anyone who sends a message.  '729 Patent, col. 4, ll. 14–18; (Docket Entry No. 57 at 14).  A message sender can be a "user," but only if that person or entity is also an intended recipient of that message.  If the administrator initiates sending the message but is not among the intended recipients, the administrator is not a "user."  The specifications make clear that "users" receiving a message can use the claimed method to respond to that message.  '729 Patent, col. 4, l. 15.  Users can also access the system to re-broadcast a prior message or reply to other messages received from an administrator.  '729 Patent, col. 8, ll. 28–34.

These capabilities do not support construing "user" to encompass all those who send messages to user-contact devices.  These capabilities are consistent with construing "user" to mean intended message recipients; a user must first receive a message from an administrator before he can respond to it.

The claims and specifications consistently associate a "user" with a "user contact device" to which the administrator sends a message and through which the user receives the message.  Claim 1 describes a "system for preparing and transmitting at least one message from an administrator using at least one processor to at least one user on a network, wherein each user of the network has at least one user contact device."  '729 Patent, col. 8, ll. 45–50.  Administrators do not have user-contact devices, as Figure 1 of the embodiment confirms.  (Docket Entry No. 40, Ex. 1 at 3).  This further supports construing "user" to cover administrators only when they are also intended message-recipients, not merely message-senders.

Claims 5 and 6 of the '729 Patent, which TechRadium does not assert, provide for a system that is capable of translating the administrator's message into different languages for different message recipients.  '729 Patent, col. 9, ll. 24–30.  An administrator could type a message in English, have it translated into Spanish, and have it sent to Spanish-speaking recipients. '729 Patent, col. 11, ll. 29–30.  Claim 5 states that "user contact data further comprises a user selected language for translating the message to be transmitted."  Claim 6 states that the administrator interface may have a "language converter for translating the message to be transmitted into a user selected language."  The specification states that it is "the recipient of the message [who] selects the language for transmission to the recipient."  '729 Patent, col. 2, ll. 53–54.  The description states that "the recipient of the message selects the language."  '729 Patent, col. 2, l. 53.  The "user" in "user

selected language" is also "the recipient of the message."

TechRadium relies on Claims 3 and 4 to argue that "user" encompasses the administrator who sends the messages.  Claims 3 and 4 both depend on the construction of Claim 1, which differentiates clearly between the administrator who sends a message and the users who receive it on their user-contact devices.  '729 Patent, col. 9, ll. 11–24.

TechRadium argues that the "customer service interface" in Claim 3 has a 411 and 911 "database connection for users of the network," and that only an administrator with high-level privileges would have access to these databases.  (Docket Entry No. 64 at 35).  But there is no evidence supporting TechRadium's argument that the "customer service database" of Claim 3 is connected to the main "dynamic information database" required by Claim 1.b, or that users could modify or access data in the "dynamic information database" through the "customer service database."  '729 Patent, col. 9, ll. 11–19.

Claim 4 of the '729 Patent claims "an advertising module is in communication with the administrator interface enabling individual advertisers to place ads in conjunction with the message."  '729 Patent, col. 9, ll. 21–24.  The specification refers to an advertising module, stating that it is "usable to hold . . . banner ads of a[n] advertiser and place the ads before or after a message as a method to enable users to self fund implementation of the system."  '729 Patent, col. 5, ll. 8–12.  Although this language appears to suggest that a "user" can be an entity implementing the notification system, the specifications for the advertising module also state that "[t]he advertising module can be used to insert header and footer files in the message to personalize the message to the group of users to whom the message is addressed."  '729 Patent, col. 5, ll. 13–15.  The isolated use of "users" in a broader context in Claims 3 and 4 does not change the construction of Claim 1,

16

which clearly differentiates between users and the administrators who send the users messages.

The claims and specifications reveal that though a "user" may also, in some circumstances, send a message or respond to a message, a "user" is always the intended recipient of a message.  The court rejects TechRadium's broader definition and construes "user" as "an intended recipient of a message sent by an administrator."

Because none of the defenses to infringement depend on the construction of the term "administrator," (Docket Entry No. 65 at 2), it is unnecessary to construe that term.

**B.       Summary Judgment**

The defendants argue that FirstCall's system cannot perform every recited step of Claim 1. (Docket Entry No. 54).  The issue is whether FirstCall's systems have "user selected grouping information comprising at least one group associated with each user of the network."  Under the TechRadium messaging system, the user — the intended recipient of a message sent by an administrator — selects which groups he wants to be part of.  The user will receive all messages the administrator sends to the groups the user has selected.  TechRadium points to FirstCall's messaging system, as described on the "How it works" section of FirstCall's website, and FirstCall's StormAlert system, as also having user-selected grouping information.  (Docket Entry No. 53, Ex. B, at 3).  FirstCall disputes this characterization.  (Docket Entry No. 54).

**1.       The FirstCall Messaging System**

The "How it works" section of FirstCall's website explains how the administrator selects recipients for a message.  (Docket Entry No. 53, Ex. B).  The website instructs that, "[o]nce logged in, you select from your unlimited emergency contact lists or use the layered GIS mapping program to select the area or region that you wish to notify."  (Docket Entry No. 54, Ex. G).  The website

17

makes clear that "you" refers to the client administrator, who selects the grouping information for "the area you wish to notify." The client administrator selects a geographic area to send the message to. All users in that area receive the message without the need to send a prior request to receive messages for that region. The "Quick User Guide," a manual for client administrators, directs the administrator to "[s]elect the list(s) to be used in the activation." (Docket Entry No. 54, Ex. C). The user guide and the "How it works" section of the FirstCall website make clear that it is the administrator, not the user, who decides what geographic area or region will receive messages. Because the recipients of the administrator's messages do not select their own grouping information, the FirstCall messaging system cannot perform all of the steps of Claim 1.

### 2.    The FirstCall StormAlert System

TechRadium alleges that FirstCall's StormAlert system uses "user selecting grouping information" because a StormAlert participant selects the NWS weather feeds he or she wishes to receive directly through FirstCall. (Docket Entry No. 56 at 26). FirstCall responds that unlike the TechRadium messaging system, StormAlert system participants select the type of information they want to receive rather than the user groups they want to be part of. (Docket Entry No. 58 at 8–9). FirstCall also contends that because the message is prepared by the NWS, and not a StormAlert system client administrator using the system's administrator interface, a message recipient is not a "user." (Docket Entry No. 54 at 9–11). Finally, FirstCall argues that the feed-selection information is not stored in the administrator's database, but rather provided separately to FirstCall.

When participants sign up for StormAlert, they tell FirstCall which NWS feeds they want to receive, such as "Avalanche Watch & Warning," "Coastal Flood Watch & Warning," or "Earthquake Warning." (Docket Entry No. 54, Ex. I). FirstCall stores these preferences directly,

but does not put them in the dynamic information database the administrator has access to.  The NWS creates and distributes the feeds.  FirstCall then implements a filter, allowing only the previously selected feeds to be passed from the NWS to the message recipients.  (Docket Entry No. 54, Ex. B, Teague Affidavit, at 5).

The StormAlert participants' selection of the feeds to receive is not a selection of grouping information.  Rather than identifying themselves as members of a particular group or groups that the administrator can select to send messages to, the participants tell FirstCall what information to send by selecting what feed or feeds the participants want to receive.  The NWS, the message-preparer, does not interact with a FirstCall system administrator interface or use a dynamic information database to send users messages according to their selected grouping preferences.

Even under TechRadium's proposed construction of the term "administrator," the NWS does not qualify, because the NWS does not interact with the administrator interface to begin the process of sending a message to a group of users.  FirstCall is also not an administrator because it does not initiate the preparation.  Because StormAlert message recipients do not receive messages that an administrator sends, the recipients are not "users" as required by Claim 1 of the '729 Patent.  A StormAlert participant's selection of NWS feeds does not identify or select grouping information to be used in preparing a message for transmission.  The record does not reveal a genuine factual dispute material to determining whether, under the messaging system or the StormAlert system, an administrator draws on user-selected grouping information stored in a dynamic information database to prepare and transmit a message to users.  The record shows that based on the undisputed facts, the claim construction ruling, and the applicable law, the FirstCall messaging and FirstCall StormAlert systems do not infringe TechRadium's '729 Patent.  The defendants are entitled to

summary judgment.

**IV.    Conclusion**

The motion for summary judgment, (Docket Entry No. 54), is granted.  Final judgment will

be entered by separate order.

SIGNED on September 29, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

20